```
           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION
```

Timothy Shane Newton,             :

     Plaintiff,                  :

    v.                              :       Case No. 2:14-cv-1369

                                       :       JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,          Magistrate Judge Kemp
                                       :
     Defendant.

                    REPORT AND RECOMMENDATION

                    I.   Introduction

    Plaintiff, Timothy Shane Newton, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for supplemental security income.  That application was filed on August 31, 2011, and alleged that Plaintiff became disabled on April 17, 2007.

     After initial administrative denials of his claim, Plaintiff was given a hearing before an Administrative Law Judge on December 5, 2012.  In a decision dated April 15, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on July 3, 2014, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on November 3, 2014.  Plaintiff filed his statement of specific errors on December 22, 2014, to which the Commissioner responded on January 22, 2015.  No reply brief has been filed, and the case is now ready to decide.

    II.  Plaintiff's Testimony at the Administrative Hearing

    Plaintiff, who was 43 years old at the time of the administrative hearing and who has his GED, testified as follows.  His testimony appears at pages 58-87 of the administrative record.

     The ALJ asked Plaintiff about his hip replacement, which

happened about a year before the hearing. Plaintiff said he still had pain and used a cane both indoors and outside. He also testified to a seizure disorder, stating that he had two seizures in the month before the hearing. They occurred despite medication. They also left him exhausted, and it took several days for him to return to normal. Additionally, Plaintiff said he had constant back pain since a 2007 accident, and that it radiated into his left leg. He had been treated with injections and physical therapy but did not get much relief. He described depression and anxiety, trouble sleeping, and problems with memory and concentration. He did not socialize much and did not like being around people. Plaintiff went to counseling every month and also saw a doctor for medication management.

In a typical day, Plaintiff would sit at home and watch television. He let his dogs in and out. He did not shop or help with household chores. He answered questions from his attorney about problems with his right hip as well, noting that his doctor had told him it would need to be replaced soon.

Plaintiff testified to last working in 2007. He did general labor as well as some auto mechanics and construction work. He stopped working due to the problems with his hip. Before that, he had another construction job, and was injured doing that job when he was hit with a backhoe. He also had worked as an auto mechanic in the early 2000s.

When asked about his physical capabilities, Plaintiff said that he could stand ten or fifteen minutes at a time, could walk less than fifteen minutes, and could sit for 45 minutes. His seizure medication made him dizzy. He did not read well and had never had a checking account. He avoided climbing stairs.

### III. The Medical Records

The medical records in this case are found beginning on page 396 of the administrative record. The pertinent records - those

relating to Plaintiff's statement of errors - can be summarized as follows.

A diagnostic assessment was done when Plaintiff sought mental health treatment from Six County, Inc., in 2010. He reported physical pain from his accident and also issues with anger and being around people. He described childhood trauma. The diagnoses included major depressive disorder, described as recurrent and severe, a personality disorder, and polysubstance dependence. His GAF was rated at 53, and it was recommended that he have a medication evaluation and services to help him manage his symptoms. (Tr. 422-28). He subsequently began counseling, and by the second visit he was calmer and reported that medication was helping him sleep. In a July 21, 2010 note he said he was "doing good." (Tr. 429). Later progress notes showed increased irritability, however, as well as problems with anger management, symptoms which continued throughout 2011.

Dr. Terry, a state agency reviewer, completed a psychiatric review technique form on August 16, 2010. She said that in addition to depression and anxiety, Plaintiff suffered from a psychotic disorder not otherwise specified. She thought he had a moderate degree of limitation in the areas of social functioning and maintaining concentration, persistence, and pace, and that he would have the most difficulty with dealing with detailed instructions, maintaining concentration and attention for extended periods, working closely with others, completing a workday and work week without interruption from psychologically-based symptoms, interacting with the public, accepting supervision, getting along with coworkers, and adapting to changes in the work setting. (Tr. 439-56). Dr. Steiger later concurred. (Tr. 595).

Another state agency reviewer, Dr. Cruz, completed a physical residual functional capacity form on August 24, 2010.

She concluded that Plaintiff could do light work although he could only stand and walk for three hours in a workday and sit six, with frequent changes in position. He could also never climb ropes, ladders, or scaffolding and could never crawl or work around heights or dangerous equipment. (Tr. 562-69). Dr. McCloud, another state agency physician, subsequently affirmed that assessment. (Tr. 594).

    Dr. Chang of Genesis Health Care saw Plaintiff on September 15, 2010 for an initial visit and two weeks later for a follow-up visit. Plaintiff's complaints included low back pain, left hip and groin pain, and upper back pain. By using Duragesic and Percocet, his pain level had dropped slightly. He demonstrated some tenderness on examination, with muscle spasm, but straight leg raising was negative bilaterally. There was some reduced sensation as well and he walked with a significant left antalgic gait. The diagnoses included chronic low back pain and left hip and groin pain, left hip sprain and strain, and chronic pain disorder. An MRI also showed evidence of L1-2 degenerative disc disease. Dr. Chang recommended additional home exercises and thought that physical therapy might be indicated if Plaintiff's pain level was better controlled. (Tr. 574-79). Plaintiff continued to see Dr. Chang and continued to report significant pain. Dr. Chang prescribed Neurontin and suggested spinal injections. Dr. Kocoloski subsequently performed a left greater trochanteric bursa injection to alleviate Plaintiff's left hip pain as well as a left sacroiliac joint injection and a lumbar epidural steroid injection. His response to the injections was "unfortunately short." (Tr. 644). Dr. Kocoloski's notes also indicated that Plaintiff's primary care physician, Dr. Bonner, had recommended a walker rather than a cane. Id. Dr. Kocoloski filled out a physical capacities evaluation form on March 28, 2011, indicating that Plaintiff was limited to lifting at the

sedentary exertional level and could either sit or stand for three to four hours in a work day, with the need to change positions frequently.  He also said Plaintiff needed a cane to walk even minimally during the workday and that he could never climb stairs or ladders or balance.  Finally, he would miss more than four days a month due to his impairments.  (Tr. 650).  Plaintiff's left hip was subsequently replaced in November, 2011.  A month later, he was described as "doing great."  (Tr. 750).

     Plaintiff first saw Dr. Gainor at Six County, Inc. in February, 2012.  He was getting over hip replacement surgery at that point.  His affect was flat but his mood was good.  He reported being irritable and not wanting to be around people.  (Tr. 776).  When she saw him again in August, 2012, he mentioned having PTSD-type symptoms about the backhoe accident and said he had been jailed for fights in the past, which was one reason he did not like to leave home.  (Tr. 784).  Two months later, Dr. Gainor completed a functional capacity form showing a number of marked limitations including being able to complete a normal workday or work week without interruption from psychologically-based symptoms, dealing with supervisors and coworkers, maintaining attention and concentration for extended periods, staying on schedule, maintaining attendance, and being punctual.  (Tr. 791-94).

     There are some additional state agency opinions found in that portion of the record relating to payment decisions.  The physical findings in those opinions do not differ materially from those already described above.  The state agency psychologists said that Plaintiff could work in a "structured setting" and was limited to simple tasks.  (Tr. 156).  It is not clear what they meant by a "structured setting."  Both appeared to adopt a prior ALJ decision about his mental residual functional capacity which, of course, did not include the most recent set of treatment

records or consideration of the treating source opinion expressed by Dr. Gainor.

## IV.  The Vocational Testimony

Dr. Finch was the vocational expert in this case.  His testimony begins on page 87 of the administrative record.

Dr. Finch first classified Plaintiff's past work as construction laborer and automobile mechanic. That work ranged from semiskilled to skilled, and from medium to heavy.

Dr. Finch was then asked some questions about a hypothetical person who could work at the light exertional level, but could reach overhead only occasionally and could only occasionally climb ladders, ropes, scaffolds, stairs, and ramps.  Also, the person could only occasionally stoop, crouch and crawl.  The person could perform only simple, repetitive tasks not requiring more than infrequent or casual contact with others and not having strict production quotas, and he or she could maintain attention and concentration for two-hour segments over an eight-hour work period and adapt to simple changes in the workplace.  Dr. Finch testified that a person with these limitations could not do any of Plaintiff's past work, but he or she could work as a retail marker, garment folder, or cleaner.  Dr. Finch also indicated how many such jobs existed in regional, State, and national economies.

A second hypothetical question was then asked.  It described a person who could do only sedentary work, but had all of the other restrictions described in the first hypothetical.  Dr. Finch said that such a person could do jobs like hand packer, assembler, and bench inspector.  Someone who needed to use a cane could not do any light jobs, but could do the sedentary ones.  However, if the person both needed to use a cane and also to alternate between sitting and standing every thirty minutes, there would be no jobs available.  The same would be true for

-6-

someone who was seriously limited in his or her ability to perform activities within a schedule and maintain regular attendance or to complete a workday or work week without interruption from psychologically-based symptoms, or who would miss four or more days per month.

> V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision is found at pages 30-44 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since his application date of August 31, 2011. Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including history of left total hip replacement, left trochanteric bursitis, osteoarthritis of the right knee, a seizure disorder (poorly controlled), myofascial back pain, lumbar spondylosis, left sacroiliac pain, anxiety disorder, depressive disorder, and history of substance abuse. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary level but that he was precluded from overhead reaching more than occasionally. He could only occasionally climb ladders, ropes, scaffolds, ramps, and stairs, and only occasionally crouch and crawl. Additionally, he was limited to the performance of simple, repetitive tasks requiring only casual and infrequent contact with others and, he could maintain attention and concentration for two-hour segments over an eight-hour workday. The ALJ found that with these

restrictions, Plaintiff could not perform his past relevant work, but he could do the sedentary jobs identified by the vocational expert, including hand packer, assembler, and bench inspector. The ALJ also determined that these jobs existed in significant numbers in the national and local economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

    VI. <u>Plaintiff's Statement of Specific Errors</u>

 In his statement of specific errors, Plaintiff identifies seven separate issues in the first two pages.  However, based on the arguments which appear later in the statement of errors, he seems to be raising only these issue: (1) the ALJ did not properly weigh the opinions of Drs. Kocoloski and Gainor, the treating sources; (2) the ALJ did not articulate good reasons for rejecting the treating source opinions; and (3) the ALJ's residual functional capacity finding was not based on the evidence.  These issues are evaluated under the following legal standard.

 <u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into

-8-

account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

A.   The Treating Source Opinions

Beginning at Page 14 of his statement of errors (Doc. 14), Plaintiff asserts that the ALJ erred by disregarding the opinion of Dr. Kocoloski as to his physical capacity, and the opinion of Dr. Gainor as to his mental capacity.  His specific arguments appear to be that Dr. Gainor's opinion is uncontradicted; that both opinions are well-supported and should have been given controlling weight; and that the ALJ did not sufficiently discuss the various factors set out in 20 C.F.R. §404.1527(c) when he discounted both opinions.  In order to address these matters, the Court begins by examining the ALJ's decision concerning the opinion evidence.

As to Dr. Kocoloski, the ALJ first described the opinion as "attributed to Dr. Kocoloski" and said that it "appears to have been completed by a person other than the one responsible for the scrawled and illegible signature." (Tr. 41).  He nevertheless appeared to consider it to be a treating source opinion.  After noting that such opinions, if properly supported and consistent with the evidence, are entitled to controlling weight, the ALJ declined to give it that weight for these reasons: (1) "[t]he doctor does not provide sufficient clinical and laboratory data to support his conclusion," id. (which was immediately followed by another statement to the effect that Dr. Kocoloski did not complete the form); and (2) "[i]t appears to be based on the

-9-

claimant's subjective report of his limitation on objective evidence; for example, there is no evidentiary support for limiting the claimant to a total of three to four hours sitting in an eight hour workday." Id.  Without any further specific discussion of the other limitations on Plaintiff's functioning which are expressed in the opinion, such as the need to alternate between sitting and standing or the need to use a cane for even minimal walking during the workday, and without any citation to conflicting medical evidence, the ALJ concluded that "[t]his report is not entitled to any significant weight and is therefore rejected." Id.

This discussion of the treating source opinion as to physical capacity is grossly inadequate.  There is a wealth of medical evidence from doctors who treated Plaintiff for hip and back pain, as well as evidence about his response to treatment.  It is simply not true that Dr. Kocoloski based his opinion only on Plaintiff's subjective complaints.  Further, other than some comments earlier in the decision about the fact that Plaintiff did not demonstrate "most of the signs typically associated with severe pain, such as muscle atrophy, spasm, rigidity, or tremor," Tr. 38 - reasons not specifically articulated as the basis for completely rejecting Dr. Kocoloski's opinion, and ones with debatable support in the record - the ALJ simply fails to explain why he gave the treating source opinion no weight whatsoever.  This is especially problematic where, as here, it was not only Dr. Kocoloski who suggested a sit/stand option, but the two state agency physicians, who said that Plaintiff would need to change positions frequently.  The ALJ gave only partial weight to their views based on the fact that there was evidence which the ALJ viewed as material and which they did not consider - but not evidence showing that Plaintiff was less limited than they believed.  Further, Dr. Finch, the vocational expert, testified that someone who needed both a cane and a sit/stand option was

not employable.  The ALJ's implicit rejection of this limitation is both a failure of his duty to articulate the reasons for rejecting all parts of a treating source opinion, and one which lacks substantial support in the record.

The Commissioner attempts to salvage the ALJ's decision by arguing that the ALJ also rejected it because it was expressed prior to the alleged onset date of disability - a reason never given, and one which is inaccurate as well as illogical (if Plaintiff became disabled before his onset date, he was presumably still disabled on that date) - and because Dr. Kocoloski did not fill out the form himself.  The ALJ made no specific finding about that, however, and in any event, even if Dr. Kocoloski did not check the boxes or write the comments in his own hand, he signed the form, and the ALJ treated it as his opinion.  The Commissioner also argues at length that the other medical records are inconsistent with Dr. Kocoloski's opinion, but the ALJ did not say that.  The ALJ's comments about the lack of support for Dr. Kocoloski's opinion appear to have been directed to the fact that the form itself did not recite the laboratory or clinical findings supporting the opinions expressed there.  Further, the Commissioner does not address the sit/stand issue at all.  Given the deference owed to a treating source opinion and the need to articulate good reasons, based on the criteria listed in 20 C.F.R. §416.927(c), to reject it, the ALJ's decision concerning Dr. Kocoloski's opinion cannot stand.  See Gayheart v. Comm'r of Social Security, 710 F.3d 365 (6th Cir. 2013); Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

As to Dr. Gainor, the ALJ said that she also "appeared" to complete a residual functional capacity form.  (Tr. 41).  He considered her to be a treating source, but concluded that because she had only seen Plaintiff three times for medical management, she did not have the in-depth relationship with him

that would make her opinion persuasive.  For that reason, and because she did not, on the form, provide a narrative explanation for her findings or "even list the claimant's diagnoses," the ALJ gave her views no weight at all.  Id.  Instead, he gave great weight to the state agency psychologist's opinions because they were "consistent with and well supported by the record as a whole ...."  (Tr. 42).  Although that statement is wholly conclusory, the ALJ did refer to his earlier discussion of the Listing Criteria as the basis for it.  However, as the Commissioner frequently points out, and as the ALJ himself acknowledged at Tr. 36, the Listing Criteria do not constitute a residual functional capacity assessment, so that reference is problematic.

Again, the Commissioner's memorandum goes into great detail about why treatment notes (which were from the same agency which employed Dr. Gainor, and presumably available to her when she assessed Plaintiff's functional capacity) do not support the limitations she imposed.  That discussion is notably absent from the ALJ's decision, and the Court cannot consider it here.  The ALJ failed in his articulation obligation with respect to Dr. Gainor's opinion as well.

      B. <u>The Residual Functional Capacity Finding</u>

The Court's conclusion that a remand is needed for further consideration of the treating source opinions, including how the treating sources viewed Plaintiff's residual functional capacity, renders the remaining assignment of error largely moot.  The Court would note, however, that the ALJ inexplicably made findings totally at odds with almost all of the RFC assessments, such as concluding that Plaintiff could occasionally climb ropes, ladders, and scaffolds (even most of the state agency reviewers found that he could never do so, and the evidence concerning his hip issues strongly support that finding), making no findings about postural limitations other than crouching and crawling (for example, stooping or balancing), and not including a restriction

of working around hazards even though Plaintiff has a documented seizure disorder which the ALJ found to be poorly controlled. Again, all but one of the state agency reviewers included that limitation in their findings.  A more complete residual functional capacity finding is therefore necessary as well.

## VII.   Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained and the case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge